**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Andrea R. James, | : | |
| Plaintiff, | : | Case No. 2:11-cv-00847 |
| v. | : | Judge Graham |
| Kaiser Aluminum Fabricated Products, Co., et al. | : | Magistrate Judge Abel |
| Defendant. | : | |

OPINION AND ORDER

This action arises from an employment dispute between the plaintiff, Andrea James, and her employer, Kaiser Aluminum Fabricated Products, LLC ("Kaiser" or "the company"). This matter is before the Court on defendant's motion for summary judgment. Doc. 33. Plaintiff asserts three claims, two under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654, and one under Ohio Rev. Code § 4112. For the reasons stated below, the Court denies the motion for summary judgment as to both FMLA claims, and grants the motion for summary judgment on the state law claim.

**I. Background**

Plaintiff started work with defendant in July of 2003 as a production analyst at its plant in Newark. Doc. 28-1 at 24. Employees at this plant belong to a local Steelworkers' union. Plaintiff soon moved into a utility operator position through the plant's bid-in process under the collective bargaining agreement. As a utility operator, she operated machines associated with the plant's remelt and finish-forge processes, and performed related jobs like packing metal into boxes before shipping. Id. at 25–31.

1

An issue arose between plaintiff and her employer in February 2010.  According to the collective bargaining agreement, job movement within the company depends on a combination of employee preference and seniority.  Doc. 37 at 11–12.  Based on these factors, defendant intended to move plaintiff into a midnight shift for the position of utility operator in early February of 2010.  Doc. 28-1 at 35–37.  Shortly before doing so, the company decided to adjust its staffing assignments and cancelled that particular shift opening for all employees.  Doc. 34 Ex. A ¶ 11.  Soon thereafter, plaintiff overheard a supervisor comment that plaintiff could not handle the job that had been cancelled.  Doc. 28-1 at 38–39.  Based on this comment, plaintiff filed an internal grievance for gender discrimination on February 19, 2010.  Doc. 28-2 at 8; doc. 34 Ex. A ¶ 9.

Plaintiff and the company agreed that she would drop her grievance, and that she would receive additional training for the previously posted job.  Doc. 28-1 at 40–42.  She reserved the right to re-file her grievance if no training occurred, id. at 42, but she did not do so.  Plaintiff did receive some training, but there is a disagreement about the amount.  Defendant contends she received 8 days of training, doc. 34 at 7, while plaintiff contends some amount less, doc. 38 at 18.  Plaintiff eventually moved to a day-shift position on May 10, 2010.  Doc. 28-1 at 53.  Up until this point, plaintiff had been working during the midnight shift, id. at 36, and the switch to a day-time job was one she wanted.  Id. at 53.  Despite the resolution of the grievance and the day-shift move, plaintiff avers that she was treated differently after her grievance.  Specifically, she claims that she was watched more closely, was forced to submit a note of justification before leaving early from work, and ultimately, that she was fired in March of the next year, 2011, in retaliation for filing the internal grievance.  Doc. 28-2 at 8–12; doc. 38 at 19.

Plaintiff's attendance resulted in additional friction with her employer. Defendant's attendance policy operates on the basis of a points system measured by what the company calls "occurrences."  Doc. 34 Ex. A ¶ 15.   An employee receives an occurrence for an unexcused absence, and half an occurrence for an unexcused late arrival.  Id.  When an employee accrues ten occurrences, he or she is put on probation. Once on probation, the employee will be discharged for receiving more than five occurrences within the next twelve-month span.  Id. ¶ 15.  According to the collective bargaining agreement's "Justice and Dignity" clause, suspended or terminated employees may continue to work while the union and the plant go through a final grievance process. Id. ¶ 14.  Two types of absences do not count against the employee in this system: FMLA-approved absences, and those excused under the company's sickness and accident ("S&A") benefits program.  Id. ¶¶ 12, 15.

While working for defendant, plaintiff took leave for both approved and unapproved reasons.  She applied for and received FMLA-covered leave seven times between August 2004 and September 2010; these periods of leave were related to personal health issues and to the birth of and care for her daughter.  Id. ¶ 19.  Unrelated to her approved leave, plaintiff was placed on attendance probation twice for a pattern of unexcused absences: once from July 7, 2008 through October 17, 2009, and again from December 18, 2009 until the official date of her termination, April 4, 2011.  Doc. 28-1 at 67–68; doc. 34 Ex. A ¶ 30.  On September 15, 2010, plaintiff failed to call off work and was assessed an occurrence.  This put her over the allowable limit of 15, and defendant informed her that was being suspended for five days, pending her discharge.  Doc. 28-2 at 39.  She filed a grievance and was allowed to continue working according to the

collective bargaining agreement.  Doc. 34 Ex. A ¶ 16.  This grievance was pending until the end of plaintiff's employment with defendant.  Id.  Plaintiff had other attendance issues as well. Although defendant's attendance policy did not prohibit leaving work early, Michael Schenk, who was plaintiff's supervisor and the superintendent at defendant's Newark facility, felt that her frequent early departures interfered with her productivity.  Doc. 37 at 36–37.  He thus directed plaintiff on May 21, 2010 not to leave early unless for an emergency.  Id. at 35; id. Ex. 4.

On September 22, 2010, plaintiff applied for FMLA-approved leave.  Doc. 35-1 at 1–4.  In keeping with the company's procedures, plaintiff and her physician, Doctor Jeremy Campbell, completed an FMLA-request form for leave relating to depression and migraines.  Doc. 36 at 14–15.  The company granted the request, id. at 18, which indicated that her migraines and depression would require ongoing medical treatment for up to six months, doc. 35-2 at 2.  Plaintiff says she dealt with migraines on a weekly basis in September of 2010.  Doc. 28-1 at 71–72.  She describes her standard migraine symptoms as "blurred vision, dizziness," and her migraines would sometimes cause her to vomit.  Id. at 71.  The severity of her migraines varied.  Some were "severe" and, in addition to her usual symptoms, rendered her unable to drive and caused her "to have to sit in a dark room until they would go away."  Id. at 71.  Some were less severe.  These were "somewhat tolerable," "the headache just wasn't as bad," and they would sometimes subside when plaintiff took her prescribed migraine medication.  Id. at 72.

According to defendant's procedure for calling off work, employees call in and provide an explanation for their absence.  Doc. 37 at 15; see also doc. 36 at 26.  Specifically, employees call what defendant refers to as "the guard office."  Doc. 37 at

15. The guard office then notifies superintendent Schenk of the absence and reason for the absence. Id. at 15. After receiving notification from the guard office, Schenk makes a notation of the absence and the explanation on a sheet that he turns in weekly to defendant's human-resources department. Id. The human-resources department ("HR") keeps Schenk informed as to which employees have received FMLA-approved leave. Schenk was aware that plaintiff had FMLA-approved leave for migraine headaches. Id. at 19. When the guard office notifies Schenk that an employee has called off work, he makes the initial "determination whether it's FMLA or if it's [an] excused absence or unexcused absence." Id. at 20. Schenk reports that when employees call off work for an FMLA-related condition, he writes an "F" on his attendance sheet—regardless of whether the guards identify the reason for missing work as just "FMLA" in general, or if they say "FMLA" and provide a specific condition (such as migraines). Id. at 21. Either way, according to Schenk, employees that call in for an FMLA-approved condition typically only identify "FMLA"—not the specific condition—as the reason for their absence. Id.

Plaintiff claims she developed a migraine on the evening of February 8, 2011. Doc. 28-1 at 148. She called off work on February 9, 2011 using defendant's call-off work number. Id. at 92. When asked for the reason she gave she said, "I believe I said I had a migraine." Id. Schenk confirms that plaintiff used the company's call-off procedure on the 9th, and confirms that he marked an "F"—for FMLA—as the reason for her absence that day. Doc. 37 at 25–26. She also called off work on February 10, 2011 and identified the reason as "FMLA." Id. When asked in her deposition "FMLA based on what," she said she was "not sure if I left just FMLA or if I had said migraine. I don't really remember how I worded it." Doc. 28-1 at 93. Schenk could not remember

whether he talked to the guard on the 10th about plaintiff's call that day, but reports that his notes for the day reflect "that she was off for FMLA."  Doc. 37 at 27.

Plaintiff asserts that her migraine on the 9th, the first day she called off work, was "a medium one" and bad "[e]nough to where [she] couldn't go to work."  Id. at 93.  She also reports that this migraine continued with medium intensity on the 10th, and that it did not subside until that evening.  Id. at 92–93.  Plaintiff went to the Newark Valley Urgent Care ("NVUC") on the 10th.  She says she went to urgent care because she could not get in to see her family physician so early in the morning.  Id. at 97.  She reported her symptoms to the urgent-care physician, saying she "had a headache," "was nauseated," and generally "didn't feel good."  Id.; see also id. at 148–49.  These symptoms match plaintiff's description of her typical migraine symptoms.  Doc. 28-1 at 71–72.  The urgent-care patient-encounter form, which was signed by the attending physician, noted that plaintiff complained of the following during her urgent-care visit: "a 2 day history of sinus congestion, sore throat, headache, body aches, and vomiting….Andrea complains of frontal/facial headaches.  She complains of sinus pressure.  Doc. 35-13 at 1.  The urgent-care physician treated her for "acute sinusitis."  Doc. 35-13 at 2.

Plaintiff returned to work the next day on Friday, February 11.  Doc. 28-1 at 94.  She reports that she "went in and handed" a note from the urgent-care facility to Schenk, "as soon as she walked in."  Id. at 95; see also doc. 37 at 29.  Plaintiff had given Schenk other doctor's notes after returning from time away, doc. 28-1 at 96, but the company did not require or request one for this absence, doc. 37 at 29–30.  Plaintiff explains that she provided the note as a way to cover her bases.  Doc. 28-1 at 96.  When asked why she felt it necessary to do so, she said: "I've just kind of felt like I had been a target for so long, I

was about to be off probation, and just was doing the right thing."  Id.  Dated February 10, 2011, the note read: "Please be advised that Andrea James was seen for a medical condition and is excused from work from Wed Feb 9, 2011 to Fri Feb 11, 2011 (inclusive)."  Doc. 35-12.  Plaintiff says she returned to work on Friday the 11th because she felt "she couldn't afford to be off a third day."  Doc. 28-1 at 148.

      Soon after providing the note, plaintiff and Schenk had an additional exchange about plaintiff's health.  Schenk was "lin[ing] [his] crews up for work" and maintains that he asked plaintiff several questions in succession: "Are you dying?  Are you okay?  Are you still sick?"  Doc. 37 at 30.  According to Schenk, plaintiff responded that it "was Bob's fault," and that she was referring to "her stepfather."  Id. at 30–31.  Bob Gallogly, plaintiff's stepfather, also works for defendant and has been employed there for forty years.  Doc. 28-1 at 112.  Schenk reports that plaintiff then said the following to him about her stepfather (with his own commentary interspersed): "If he would go get taken care of when he was sick, then she coughed, meaning he had a cough, that's how I took it.  And, I mean, she said, I wouldn't catch it or get it or to that extent."  Id. at 30–31.  Plaintiff confirms that she spoke to Schenk that morning, and says she "believe[s] [she] said something along the lines of 'Wish my dad would cover up his cough' or something."  Doc. 28-1 at 94.  Plaintiff's counsel objected at her deposition to the line of questioning that elicited this answer: "I'll object to facts not in evidence.  She didn't say it was about her absence; you asked what she discussed with [Schenk]."  Doc. 28-1 at 95.  Her counsel also argues in his reply brief that it was not her intent to communicate that her cough was the reason she missed work.  Doc. 38 at 3; doc. 28-1 at 95.

Schenk knew that plaintiff had called off for an FMLA-related reason, and thought that her note and her comment about her stepfather's cough were inconsistent with an FMLA-related absence.  Doc. 37 at 31.  He then called the HR manager Jeff Kirk.  Doc. 36 at 27.  Kirk reports that Schenk told him the following: that plaintiff had brought in an excuse slip for her days out; that she had also "verbally told him the major reason she missed you could blame on her stepfather"; and that Schenk wondered whether her excuse slip and—from his perception—verbal excuse were "consistent with her FMLA."  Id.  Kirk asked Schenk to document the incident, id., and Schenk did so by sending Kirk an e-mail at 9:23 a.m. that morning:

> 2/11/11
>
> I was setting at my desk on 2/11/11 and around 6:30 am Andrea walked in my office and put a Dr. excuse on my desk for her absents [sic] on 2/9/11 and 2/10/11.  Later at just before 7:00 am I talked to her and gave her her shift assignment and asked her if she was dying (meaning from her being sick) and she said it was Bobs [sic] (her step dad) fault because if he would go to the Dr. when he had a cough (she put her hand to her mouth and coughed) he would not pass it around.
> Mike....

Doc. 34 at Ex. B, Ex. 2.  Schenk was asked in his deposition about his thoughts when plaintiff handed her note to him the morning she returned to work, which led to the following exchange:

> Q: So when she handed you the return to work slip on the 11th, did you view that as an opportunity to do something about it?
>
> A: To do something about it?
>
> Q: Uh-huh.  Her attendance issue.
>
> A: I was aware where she was at with her points, and I knew she couldn't have no more, and I knew that if we could get one more point, we could—we could have her—we could give her five days suspension to discharge.

> Q: And that was your goal?
>
> A: It was my goal to—yeah.  She was a habitual absentee problem; and, you know, they play the game—absentee control policy—they play the game with points.  She was one of the worst habitual absent problems I had, and I was trying—I was paying attention—close attention to her, and my goal was to stop it.  I tried everything I could to stop it.  And it takes a lot to get terminated there for absenteeism.
>
> Q: So when you couldn't stop it, your goal was to get her out of there?
>
> A: My goal was to make sure we followed the policy.
>
> Q: Meaning what?
>
> A: That she got points when she deserved them.

Doc. 37 at 37–38.

After Kirk got Schenk's email, he "compared" plaintiff's urgent-care absence slip "back to her FMLA folder [and] did not see that [it] was consistent her FMLA."  Id. Based on all of this information, Kirk decided to investigate plaintiff's absence.  Doc. 34 Ex. A ¶ 21.  He "initiated an investigation by having the HR department contact the [NVUC]…to clarify what the 'medical condition' identified in the doctor's excuse was." Id.  After the NVUC received a release form, Tanisha, the NVUC office manager, faxed defendant a copy of the doctor's excuse on February 11 with the following hand-written message underneath: "Pt was seen for sinus infection."  Doc. 35-19 at 4; see also doc. 34 Ex. A ¶ 22.  On February 15, 2011, after "talking further with Mr. Schenk, reviewing the call off logs for February 9 and 10, 2010, [and] reviewing Ms. James' [FMLA] certification," Kirk faxed the NVUC another note "asking whether Ms. James complained of migraines or if she presented any migraine symptoms when she visited their physician on February 10."  Id. ¶ 23.

In his affidavit, Kirk notes that he took the steps he did because if plaintiff's "absence was unexcused...[it] would result in her discharge under the Attendance Control Policy."  Id.  He thus said he wanted to "be absolutely sure that her illness and/or treatment [at the NVUC] did not relate to migraines."  Id. ¶ 24.  He knew that if her visit to the NVUC "did relate to migraines, then her absence would have been covered by her FMLA certification, and it would be excused."  Id.  The NVUC faxed Kirk a copy of plaintiff's medical records from her visit to the urgent-care center on February 10, 2011. After reviewing them, he "noted that the records did not reflect any complaints about migraines, any past history of migraines, or any diagnosis of migraines."  Id. ¶ 27.  Based on the information he received and on his communications with Schenk, Kirk came to the following conclusions:

> I concluded Ms. James' absence was related to a sinus infection she apparently caught from her step-father, and was not related to any alleged migraine because there was no evidence or indication of migraines suffered by Ms. James in her visit to the NVUC doctor.  Accordingly, I concluded that Ms. James absence was not related to a migraine and therefore was not covered by her FMLA certification.

Id.  The urgent-care report does not mention the word migraine.  See doc. 35-13 at 1–3. Kirk does not indicate whether he spoke to plaintiff as part of his investigation.  When asked in her deposition about why she did not mention migraines to the urgent-care doctor, plaintiff said that she "wasn't going to see him for a migraine."  Doc. 28-1 at 98. She followed by saying, "I don't need to go see an urgent care doctor for my migraines; I'm already prescribed medication for that."  Id.

Because plaintiff was already on attendance probation at this time and had 14.5 points, id. ¶ 24, her unexcused absence put her over the allowable limit of 15, id. ¶ 27. She was thus subject to discharge under the company's attendance program.  Id.  In

accordance with the program, plaintiff received a five-day suspension on February 15, 2011, which was to precede her termination. Doc. 36 at 25. According to Kirk, the company withdrew the occurrence that led to defendant's September 2010 discharge "when the events resulting in her February 2011 discharge occurred because it did not need both instances to support her termination." Doc. 34 Ex. A ¶ 16.

Plaintiff disputed Kirk's decision to terminate her employment and filed a union-backed grievance. Plaintiff sent a letter to her regular physician, Dr. Jeremy Campbell, on February 22, 2011 asking for his help. It read in full:

> Dr. Campbell I really do need your help. I came to see you yesterday and you changed my prescriptions for migraines. I am going to lose my job because when I went to Urgent Care last week they forwarded my medical information to Kaiser and said it did not state anywhere that I had a migraine. I knew I had a migraine and the only reason why I went back is because of my mom thinking I might be getting bronchitis. My daughter had her tonsils out a few weeks ago and my mom thought since I was off for my FMLA/migraine that maybe I should go to Urgent Care since I could not get into see you so that I would not get my daughter sick. They are saying I lied.
>
> Can't you have two illnesses at the same time? They diagnosed me with something viral possibly sinusitis, can sinusitis be misdiagnosed another name for migraine? They ask me what pills I took on a daily basis and I forgot to give them my migraine medicine because I only take that as needed. Can you write me a note stating that you can have two illnesses and that I had prescriptions for my migraines and that I did not need to come see you? I hope this makes sense. I really do need my job and you are the only one that can possible [sic] save it for me. I need this note by Friday or I will be fired.
>
> Thanks
>
> Andie James

Doc. 28-2 at 66. Dr. Campbell responded by sending a letter to Kaiser on February 25, 2011. Doc. 35-14. The letter discussed the possibility of a relationship between sinus infections and migraines, and read in full: "My patient Andrea James has [sic] history of migraines and is currently being treated with chronic migraine medications, [sic]

migraines can be flared up by up [sic] by other medical conditions including sinus infections."  Doc. 35-14.  Kirk deemed the letter to be "speculative [and] gave it very little weight" in coming to his final conclusion. Doc. 34 Ex. A ¶ 29.  The union soon withdrew her grievance, and James worked her last day at the company on March 30, 2011.  Doc. 28-1 at 106.

Plaintiff brought this suit in the Licking County, Ohio, Court of Common Pleas on August 23, 2011.  She asserted the following five claims against defendant: (1) FMLA interference; (2) FMLA retaliation; (3) gender discrimination under O.R.C. § 4112; (4) retaliation under O.R.C. § 4112; and (5) breach of confidentiality under Ohio law relating to the release of her medical records.  Plaintiff also brought one claim for breach of confidentiality against the NVUC for its role in sending her medical forms to defendant; she dismissed this claim under Federal Rule of Civil Procedure 41(a).  Doc. 40.  Defendant timely removed the action to this Court on the basis of federal question jurisdiction.  Doc. 2.

Defendant moved for summary judgment on all five counts.  Doc. 33.  In response to defendant's motion, plaintiff dropped her Ohio gender-discrimination claim and her breach-of-confidentiality claim.  Doc. 38 at 3.  Her FMLA claims for interference and retaliation remain, as does her state law retaliation claim.

**II. Standard of Review**

Under Fed. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The

moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the

light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252; see Dominguez v. Correctional Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

**III. Discussion**

      **A. The FMLA Claims**

      Two of plaintiff's claims arise under the FMLA.  The basic purposes of the FMLA include: (1) to help "balance the demands" of the workplace and those of families, as well as to promote the economic stability of families, and (2) "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1), (2).  To those ends, the FMLA allows a qualifying employee up to twelve weeks of unpaid leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of his or her position.  29 U.S.C. § 2612(a)(1)(D); see also Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

      Plaintiff asserts claims for FMLA interference and for FMLA retaliation.  Section 2615(a)(1) mandates that an employer not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  Further, § 2615(a)(2) bars an employer from "discharg[ing] or in any manner discriminat[ing] against any individual for opposing any practice made unlawful by" the FMLA.  The Sixth Circuit has recognized that this kind of "discrimination" includes "retaliation" for taking FMLA leave.  See, e.g., Arban v. W. Publ'g Corp., 345 F.3d 390, 401 (6th Cir. 2003).

### 1. Interference

To prevail on her interference claim under 29 U.S.C. § 2615(a)(1), plaintiff must prove that: (1) she was an eligible employee; (2) the company was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the company notice of her intention to take leave; and (5) that the company denied her FMLA benefits to which she was entitled.  See Edgar v. JAC Products, Inc., 443 F.3d 501, 507 (6th Cir. 2006).  The parties disagree on whether plaintiff was entitled to FMLA leave and on whether defendant denied plaintiff's FMLA-covered leave.

FMLA coverage extends to "a serious health condition that makes the employee unable to perform the functions" of his or her position.  29 U.S.C. § 2612(a)(1)(D).  The FMLA further defines "serious health condition" as an "illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility," § 2611(11)(A), or "continuing treatment by a health care provider," § 2611(11)(B).

The parties disagree on whether plaintiff's absence in February of 2011 was caused by a serious health condition within the meaning of the FMLA.  Plaintiff submits evidence from which a reasonable jury could conclude that the FMLA would cover her migraines and depression.  Doc. 28-1 at 70–73; doc. 35-2 at 1–4.  Her doctor filled out the company's form for its FMLA certification process, and indicated that her migraines and depression would require ongoing medical treatment for up to six months.  Doc. 35-2 at 2.  Defendant granted plaintiff's request for FMLA coverage because of her migraines, doc. 36 at 18, and does not dispute that the migraines are a serious health condition for

purposes of the FMLA.  Plaintiff testified to having migraines and to exhibiting what she characterized as her standard migraine symptoms during her absences in February 2011.

Defendant argues that plaintiff's absences from work in February of 2011 were not for a migraine, but for another issue, a sinus infection.  Doc. 34 Ex. A ¶ 27; see also doc. 34 at 13.  Plaintiff does not attempt to show that her sinus infection itself counted as its own "serious health condition" deserving of FMLA coverage.  Instead, the parties' disagreement centers on whether plaintiff's treatment for her sinus infection undercuts her claim that she missed work due to a migraine, a condition for which the company had already approved FMLA coverage.  Plaintiff argues that a genuine issue of material fact exists as to whether she was absent for an FMLA-covered illness.  Doc. 38 at 10.

Plaintiff testified in her deposition that her migraine extended from February 8, doc. 28-1 at 148, until the evening of February 10, id. at 93–94.  She testified that she identified "FMLA" as the reason for her absences when calling into defendant on the 9th and 10th, id. at 92, which Schenk's documents confirm, doc. 37 at 25–27.  Additionally, she points to the fact that she reported having a headache to the urgent-care doctor.  Id. at 97; doc. 35-13 at 1.  And she argues that some of the additional symptoms—specifically vomiting and nausea—from the urgent-care "Patient Encounter" report, doc. 35-13 at 1–3, match some of her standard migraine symptoms, doc. 28-1 at 72.  She also puts forth the note that her regular doctor sent to defendant asserting that she had a "history of migraines," was "currently being treated with chronic migraine medications," and that "migraines can be flared up…by other medical conditions including sinus infections." Doc. 35-14.

In response to plaintiff's argument that her sinus issues were related to her migraines, defendant argues that she presents no affirmative evidence on this point, and that her assertion is merely conclusory.  Doc. 39 at 4–5.  Defendant also argues that plaintiff's after-the-fact doctor's note is speculative as to the connection between the sinus infection and her migraines, as the doctor did not treat her for the issue at hand. Doc. 34 at 15.  Defendant further argues that her sinus issues and migraines were not related by pointing to several parts of plaintiff's deposition testimony: that she admitted not mentioning past migraine issues to the urgent-care doctor, doc. 28-1 at 98; that she admitted not telling the doctor that she had a migraine that day, id.; that she "wasn't going to see" the urgent-care doctor "for a migraine," but "for other reasons," id.; and that she did not "need to go see an urgent care doctor for [her] migraines" because she was "already prescribed medication for that," id.  Defendant also points to the urgent-care report, which does not refer to migraines.  Doc. 35-13 at 1–3.  Finally, defendant cites the urgent-care doctor's stated diagnosis for the "medical condition" behind plaintiff's visit: a sinus infection. Doc. 35-13 at 2; doc. 35-19 at 8–10.

The evidence presents a genuine dispute of material fact on the issue of whether plaintiff's absences in February 2011 were caused by a serious medical condition under the FMLA.  A reasonable jury could find that they were.

The parties also disagree on the final element of the interference claim: whether the company indeed denied her the FMLA leave to which she may have been entitled. Defendant argues that it did not deny plaintiff's leave because it let her take work off initially and only terminated her after she returned.  Doc. 34 at 11–12.  This argument has no merit.  Plaintiff may state a claim for interference by alleging that the defendant

"shortchange[d]" her leave, as she alleges defendant did here by counting one day of absence as unexcused.  Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012).  Though defendant initially granted plaintiff's requested FMLA leave, it ultimately decided that it would categorize her absences in February 2011 as unexcused and not as FMLA leave.  See Haley v. Community Mercy Health Partners, No. 3:11-cv-232, 2013 WL 322493, at *14 (S.D. Ohio Jan. 28, 2013) (holding that final element of an interference claim was satisfied where the employer, despite initially granting plaintiff's requested FMLA leave, later refused "to categorize her leave as FMLA").  There is no requirement that interference take the form of a prior denial of FMLA leave.

For the reasons stated above, the Court denies defendant's motion for summary judgment on plaintiff's claim of FMLA interference.

### 2. Retaliation

Plaintiff claims that Kaiser violated 29 U.S.C. § 2615(a)(2) by retaliating against her for taking what she claimed to be FMLA-approved leave on February 9 and 10 of 2011.  This circuit "applies the familiar burden-shifting test articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to retaliation claims under the FMLA."  Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006).

According to the burden-shifting approach, plaintiff must first establish a prima facie retaliation claim.  To do so she must show the following elements: (1) that she engaged in an activity protected by the FMLA; (2) that her employer knew she exercised her protected rights; (3) that her employer then took an employment action adverse to her; (4) and that a causal connection exists between the protected activity and the adverse

employment action.  See Arban, 345 F.3d at 404.  "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce" each element of the claim.  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).  If she presents her prima facie case, the burden shifts to defendant to provide a "legitimate, nondiscriminatory reason" for plaintiff's discharge.  Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001).  If the employer can do so, plaintiff then has an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Plaintiff meets her prima facie burden.  With respect to the first element, she has put forth evidence that the FMLA covers her migraines, doc. 28-1 at 70–73; doc. 35-2 at 1–4; and she claims that migraines caused her to take leave for the time at issue.  Plaintiff also supports the remaining elements of her prima facie claim: the company granted her initial FMLA-leave request and knew plaintiff cited this leave as the reason for her absences on February 9 and 10, 2011, doc. 34 Ex. A ¶¶ 20–21; she was ultimately terminated, which is an adverse employment action; and the close proximity in time between her FMLA leave and termination satisfies the causal-connection requirement, id. at ¶ 28.

In response, the company properly produces a legitimate, nondiscriminatory reason for plaintiff's discharge: the company's belief that plaintiff's leave was not covered by her FMLA certification, and therefore was unexcused.  Id.  With the burden shifted, plaintiff can demonstrate discriminatory pretext for her termination in one of three ways: "by showing that the proffered reason (1) has no basis in fact, (2) did not

actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). In support of its proffered reason, however, defendant invokes the honest-belief defense. Where an "employer can demonstrate an honest belief in its proffered reason…, the inference of pretext is not warranted." Seeger, 681 F.3d at 285 (quoting Joostberns v. United Parcel Servs., Inc., 166 F.App'x. 783, 791 (6th Cir. 2006)).  A successful honest-belief defense thus means that the falsity of the employer's proffered reason makes no difference.  As long as the employer indeed holds an honest belief in its proffered reason, "the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998).

Under the Sixth Circuit's honest-belief rule, "[a]n employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made." Seeger, 681 F.3d 285 (quoting Joostberns, 166 F.App'x at 791).  Establishing a proper honest-belief defense "does not automatically shield" defendant, as plaintiff has the "opportunity to produce evidence to the contrary." Seeger 681 F.3d at 286.  Plaintiff can show that defendant "failed to make a reasonably informed and considered decision before taking its adverse employment action." Chrysler Corp., 155 F.3d at 807–08.  Or she could "produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[]…did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." Tingle v. Arbors

at Hilliard, 692 F.3d 523, 531 (6th Cir. 2012) (quoting Braithwaite v. Timken Co., 258 F.3d 488, 493–94 (6th Cir. 2001)).

Defendant asserts an honest belief that plaintiff's time away from work was unexcused because she was out for a condition not covered by the FMLA.  Doc. 34 at 13. The initial question is whether defendant reasonably relied on the "particularized facts" before it in concluding that the FMLA did not cover plaintiff's time off of work.  Seeger, 681 F.3d at 285 (quoting Joostberns, 166 F.App'x at 791).  The company avers that it looked into plaintiff's absences because of her own inconsistencies in reporting them. Doc. 34 at 14.  It sought and received a copy of the record from her urgent-care visit, which made no mention of a migraine, Doc. 34 Ex. A ¶ 26; and it verified with the NVUC that plaintiff was treated for a sinus infection, id. ¶ 22.  Before coming to its final decision, plaintiff had a chance as part of the company's grievance process to present defendant with additional evidence.  She put forth the note from her regular physician, which Kirk discredited because it did not speak to plaintiff's condition on the days she missed work.  The company concluded that plaintiff misrepresented the reason for her time away from work and subsequently terminated her employment.  The evidence relating to the investigation conducted by defendant establishes that it was reasonable, particularized, and thorough.  See Seeger 681 F.3d at 287 (proffered reason for termination had reasonable basis in fact where employer conducted thorough investigation in which plaintiff had an opportunity to submit additional information).

Plaintiff attempts to undercut this honest-belief defense.  She first attacks the quality of defendant's investigation calling the investigation a "sham," doc. 38 at 16. Plaintiff contends that defendant should have consulted either plaintiff or her current

physician or other physicians for additional information.   However, the company's decision-making process need not "be optimal or [leave] no stone unturned."  Chrysler Corp., 155 F.3d at 807.  Defendant did consider a note from plaintiff's regular doctor – a note it considered speculative.  The Court may not "second guess the business judgment" at issue, but must "simply evaluate whether the employer gave an honest explanation of its behavior."   Hedrick, 355 F.3d at 462.   Here, the defendant's proffered reason for termination has a basis in fact.

Plaintiff next argues that defendant did not honestly believe in its proffered nondiscriminatory reason – that it did not actually motivate the termination of plaintiff. Plaintiff's supervisor, Mike Schenk, spoke about the company's approach to plaintiff's absences on February 9 and 10 of 2011.  He stated that he was frustrated with plaintiff's attendance, and with his inability to do anything about it because of the company's absentee policy.  Doc. 37 at 37.  He further testified that when plaintiff handed him her urgent-care excuse for her absences, he "was aware where she was at with her [attendance] points" and "that if we could get one more point, we could—we could have her" terminated.  Id. at 37–38.  When asked if that was his goal, he replied, "yeah," that plaintiff "was one of the worst habitual absent problems" he had, that he was paying "close attention to her" because "it takes a lot to get terminated there for absenteeism." Id. at 38.  He finished this exchange in his deposition by saying that it was his "goal to make sure we followed the policy" and that "she got points when she deserved them."  Id.

Schenk's statement that it was at least in part his goal for plaintiff's unexcused time away from work to push her over the line toward termination undercuts defendant's honest-belief defense.   He made the statement in the context of calling plaintiff a

"habitual absentee problem."  Doc. 37 at 48.  His statement could thus support an inference that defendant had an ulterior motive for terminating plaintiff, one caused by plaintiff taking FMLA-protected leave.  For this reason, it is evidence from which a "jury could reasonably reject [the defendant's] explanation and infer that defendant…did not honestly believe in the proffered nondiscriminatory reason" for the termination.  <u>Tingle</u>, 692 F.3d at 531 (quoting <u>Braithwaite</u>, 258 F.3d at 493–94)).

In sum, plaintiff has presented a prima facie claim for discrimination as well as affirmative evidence to rebut defendant's honest-belief defense that supports her claim that she was discriminated against for exercising her rights under the FMLA.  The Court denies defendant's motion for summary judgment as to this claim.

### B. Retaliation under Ohio Law

Plaintiff's remaining claim alleges that defendant retaliated against her in violation of Ohio Revised Code § 4112.  Section 4112.02(I) bars discrimination against a person who: "has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."  Plaintiff asserts that defendant retaliated against her for filing an internal grievance alleging gender discrimination.  Doc. 3 at 10.

Analysis of potential violations under § 4112 tracks that applied in federal discrimination cases.  <u>See, e.g.</u>, <u>Little Forrest Med. Ctr. v. Ohio Civil Rights Comm'n</u>, 61 Ohio St.3d 607, 609–10, 575 N.E.2d 1164, 1167 (Ohio 1991).  In order to prevail, plaintiff first must establish a prima facie case of retaliation.  To do so, she has to prove the following: (1) she engaged in a protected activity; (2) defendant was aware that she

engaged in that activity; (3) defendant then took an adverse employment action against her; and (4) a causal connection existed between the protected activity and the adverse action.  See Greer-Burger v. Temesi, 116 Ohio St.3d 324, 327, 879 N.E.2d 174, 180 (Ohio 2007).  The burden then shifts to defendant to "articulate some legitimate, nondiscriminatory reason" for its actions.  Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  If defendant can do so, the burden shifts back to plaintiff to show  "that the proffered reason was not the true reason for the employment decision." Id. (citing Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Plaintiff's state-law retaliation claim falls into two parts.  She claims that defendant retaliated against her for filing an internal gender-discrimination grievance by terminating her employment and by taking additional non-termination employment actions that were allegedly adverse.  With respect to her non-termination examples, defendant argues that the Court does not need to reach the burden-shifting issue because plaintiff fails to meet her prima facie burden.  Doc. 34 at 16.  Specifically, the company maintains that plaintiff cannot show that she experienced an adverse employment action. Plaintiff provides several examples of alleged adverse employment actions that would, in her argument, constitute retaliation under Ohio law: that defendant failed to train her for a new position to the full extent of its promise to do so; that her bosses watched her more closely after her grievance; and that she was not permitted to leave work early unless for an emergency.

The Sixth Circuit has held that in order to be "adverse," the employer's actions must be "materially adverse."  See, e.g., Bowman v. Shawnee State Univ., 220 F.3d 456, 461 (6th Cir. 2000) (quoting Hollins v. Atl. Co., 188 F.3d 652, 662 (6th Cir. 1999)).  This

means that the actions at issue "must be more than a mere inconvenience or an alteration of job responsibilities." Id.  For example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities" might qualify as a materially adverse action.  Id.; see also Keeton v. Flying J, Inc., 429 F.3d 259, 265 (6th Cir. 2005) (job transfer that results in a longer commute might qualify).  Non-termination adverse employment actions, in other words, must be "of the magnitude of a termination of employment, a demotion, a decrease in salary, [or] a material loss of benefits." Willis v. Pennyrile Rural Elec. Co-op. Corp., 259 F. App'x 780, 783 (2008).  On the other hand, "*de minimis* employment actions are not materially adverse." Bowman, 220 F.3d at 462 (quoting Hollins v. Atl. Co., 188 F.3d 652, 662 (6th Cir. 1999)); see also Kocsis v. Multi-Care Mgmt. Inc., 97 F.3d 876, 884 (6th Cir. 1996) (job reassignments that carry the same salary and hours generally do not qualify as materially adverse).  Applied here, plaintiff's non-termination examples of alleged adverse employment actions fail as a matter of law.

Plaintiff first asserts that she did not receive training to the extent Kaiser promised as part of the agreement to drop her employment grievance.  Even if true, receiving somewhat less training than what was promised does not amount to a material change in the terms of her employment.  See, e.g., Vitt v. City of Cincinnati, 97 F.App'x 634, 639 (6th Cir. 2004) (no adverse employment action for failure to provide computer training or failure to allow employee to attend seminars).  Plaintiff's retaliation claim thus fails insofar as it relies on her not being trained to the full extent of a promise.

Plaintiff next claims that she felt like her supervisors watched her more closely than the other employees; and that the company subjected her to treatment worse than

that of her peers by asking her questions about an absence upon her return.  With respect to her example about being watched closely, she admitted in her deposition to being somewhat unsure as to whether her supervisors were indeed watching her or her colleagues.  Doc. 28-1 at 56.  More importantly, plaintiff fails to put forth any evidence for both claims regarding how watching her more closely or asking additional questions might rise to the level of a materially adverse employment action.  Additional supervision and asking questions are also the kind of "*de minimis* employment actions" that "the Sixth Circuit has consistently held…are not materially adverse." Bowman, 220 F.3d at 462 (quoting Hollins, 188 F.3d at 662).

Plaintiff also claims that she was not allowed to leave work early unless for an emergency or when she had her supervisor's permission.  While this might have made plaintiff's job slightly more difficult, it did not make it "significantly more difficult." Worthy, 433 F.App'x at 376.  This is exactly the kind of "inconvenience" that does not rise to the level of materially adverse.  See Bowman, 220 F.3d at 461.

Plaintiff's only adverse employment action is termination, which she claims came in retaliation for filing an internal discrimination grievance.  Defendant argues that plaintiff provides nothing more than a bald assertion that her termination came in retaliation for the internal grievance.  Part of plaintiff's prima facie burden requires her to provide some evidence of a causal connection between her internal discrimination grievance and her termination.  See Temesi, 116 Ohio St.3d at 327, 879 N.E.2d at 180.  Her termination example fails on this count.  She presents no evidence that her termination had anything to do with her original sex-discrimination grievance a year earlier.  And "where some time elapses between when the employer learns of a protected

activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008).  In this case, plaintiff's termination came over a year after her internal grievance.  Given the lack of causal evidence for the delay between her grievance and her termination, this claim fails as a matter of law.

In sum, plaintiff has failed to meet her burden of establishing a prima facie claim of retaliation under Ohio law as it applies to all of defendant's alleged adverse employment actions.  As for her termination example, it fails on causal-connection grounds.  Defendant is thus entitled to summary judgment on plaintiff's retaliation claim under Ohio law.

**IV. Conclusion**

For the reasons set forth above, defendant's motion for summary judgment (doc. 33) is GRANTED IN PART AND DENIED IN PART.  The Court denies the motion for summary judgment as to plaintiff's FMLA interference and retaliation claims, and grants the motion as to her Ohio-law claim for retaliation.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

Date: April 1, 2013

27